# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 25, 2010 Session

## PATRICK JOSEPH RIGGER v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Knox County
### No. 90084    Mary Beth Leibowitz, Judge

### No. E2009-01052-CCA-R3-PC - Filed September 10, 2010

The petitioner, Patrick Joseph Rigger, appeals from the Knox County Criminal Court's denial of post-conviction relief from his general sessions court guilty-pleaded convictions of misdemeanor evading arrest and misdemeanor possession of a weapon. Although the post-conviction court determined that the Knox County General Sessions Court's procedure of communicating to defendants *en masse* the litany of constitutional rights prior to accepting pleas of guilty did not satisfy the rigors of due process principles, the post-conviction court denied relief to the petitioner. The petitioner appeals and claims that the lower court erred in failing to find that his guilty pleas were involuntary, unknowing, and/or unintelligent. He also claims that the warrant alleging his illegal possession of a weapon inadequately charged an offense and that his actual innocence of that charge entitled him to post-conviction relief. Because the record supports the post-conviction court's order, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jason Hunnicut, Assistant District Attorney General, for the appellant, State of Tennessee.

Mark E. Stephens, District Public Defender, for the appellee, Patrick Joseph Rigger.

### OPINION

The petitioner's October 7, 2008 petition for post-conviction relief in the Knox County Criminal Court challenged misdemeanor convictions imposed by the Knox County

General Sessions Court on October 8, 2007.[1]  On September 16, 2007, the petitioner was charged by warrants obtained in the general sessions court with failure to provide evidence of compliance with the financial responsibility law, evading arrest, unlawful possession of a weapon, and a roadway lane violation.  He was arrested on October 5, 2007, and he pleaded guilty to misdemeanor evading arrest and unlawful possession of a weapon during his first appearance in the general sessions court on October 8, 2007.

In the post-conviction evidentiary hearing, the petitioner testified by deposition that he was 33 years of age and had received an eighth grade education.  He testified that he was arrested on Friday, October 5, 2007, and was held in custody from 10:00 a.m. on October 5 until he appeared in the Knox County General Sessions Court on Monday morning, October 8.  He stated that he had been taken before a magistrate at 3:00 a.m. on Saturday, October 6, but because the video camera provided for recording the appearance was inoperable, the arraignment was postponed until Monday, October 8.  The petitioner testified that he had not been informed of the nature or the number of the charges until he was taken to court on October 8.  He testified that he arrived in court on that day with a group of 50 to 60 prisoners and that he was arm- and leg-shackled to another prisoner.  He recalled that he was seated in a row of inmates "[t]wo or three rows back" and that the guards told the prisoners, "Sit down; shut up and look straight ahead."  He stated that the prisoners were told to make no eye contact with anyone and to avoid communicating with anyone in the audience, upon penalty of being sent back to the penal farm.  He described the court room as being packed, containing "roughly around 200 maybe."

The petitioner testified that, after sitting in the court room for a while, he "flagg[ed] down" a man he believed was an attorney; the petitioner at first believed the man was his lawyer, but before the pleas were arranged, the man introduced himself as an assistant district attorney general.  When asked in the deposition whether he worked out his cases, the petitioner, who was on parole for burglary at the time, responded, "I did."  He testified that the prosecutor told him that upon approval of the plea agreement, he "would get time served and [would] go home" that day.  The petitioner agreed to plead guilty to misdemeanor evading arrest and unlawful possession of a weapon in exchange for an effective 11-month, 29-day suspended sentence and the dismissal of the other two warrants.

The warrant forms contained in the record show the petitioner's signatures on the waivers of the right to counsel and of grand jury indictments and jury trials.  The petitioner also signed a more extensive waiver of rights form.  He testified that he did not

---

[1]Tennessee Code Annotated section 40-30-104 provides:  "Petitions challenging misdemeanor convictions not in a court of record shall be filed in a court of record having criminal jurisdiction in the county in which the conviction was obtained. . . ."  T.C.A. § 40-30-104(a).

read the warrants but admitted that he "possibly" had the opportunity to do so. The petitioner acknowledged his signature on each waiver line but claimed that he had signed where the prosecutor had indicated by making an "x" mark near each line. He testified that he declined to read the waiver language because he "was trusting this guy." He stated that he thought the waiver of rights form that he signed was a forfeiture of the weapon. He testified that, other than his signatures, the handwriting on the various forms was inserted by someone other than himself.

He testified that the judge explained the prisoners' rights to the "whole courtroom," amidst much talking and other noise. Later, the general sessions judge engaged him in a dialogue about his charges and pleas, but the petitioner testified that he did not approach the bench; rather, he "stood up right where [he] was" when his name was called and was still handcuffed and shackled to his neighbor in the seating row. The petitioner testified that he was not asked whether he wanted an attorney or whether he wished to waive his constitutional rights. He testified that the general sessions court judge told him that "if you want to stay out of jail, don't get in trouble, that's all you got to do."

The petitioner exhibited to his testimony a transcript of the colloquy between himself and the general sessions court judge. In the transcript, the general sessions court judge, apparently addressing a number of defendants in the courtroom, advised the addressees of the right to counsel, the standard of probable cause for preliminary hearings, the role of the grand jury and the right to grand jury consideration, the right to jury trial, the State's burden of proof, the right to confront witnesses testifying against them, the right to compulsory process, the right to testify and to not testify, the rule of unanimity of a jury's verdict, the right to appeal, and the possibility that a conviction could aggravate the punishment levied in any future convictions. The transcript then moves to the individual colloquy after the petitioner's name was called:

> [Prosecutor]: Patrick Rigger. Your Honor, Mr. Rigger is pleading guilty to unlawful possession of a weapon, a C misdemeanor, forfeit the weapon, time served; also pleading guilty to . . . evading arrest[,] 11/29 all time suspended; the other two charges will be dismissed.
>
> [Judge]: Mr. Rigger, do you understand the rights [I] went over with you?
>
> [Petitioner]: Yes sir.
>
> [Judge]: The DA has announced two of these cases are being

dismissed[;] you will be pleading guilty to evading arrest, 11 months 29 days unsupervised probation. You got to stay out of trouble and pay the court costs. Your weapons possession will be time served[,] but you have to forfeit the weapon. Do you understand? [It m]eans you got to stay out of trouble for 11 months[,] 29 days. If you don't[,] you're going to be . . . like these other people that have been coming up here and messing up[. D]o you understand? So it's up to you[;] if you want to stay out of jail[,] don't get in trouble[;] that's all you got to do. How do you plead, guilty or not guilty?

[Petitioner]: Guilty.

[Judge]: Find you guilty[,] the judgment of the court. Good luck to you.

The petitioner testified at the evidentiary hearing that he had been on parole successfully since February 7, 2006, and that he did not believe that his possession of a rifle violated his parole's prohibition of possessing a deadly weapon. He testified that he would not have pleaded guilty in the general sessions court had he known that the convictions would result in a parole revocation or a federal charge.

On cross-examination, the petitioner admitted that, prior to October 8, 2007, he had been in court several times. He agreed that, in 1999, he had pleaded guilty to burglary charges in the Knox County Criminal Court and that the judge had appointed him an attorney at that time. He further acknowledged that he had always had counsel appointed for him in all of his other charges prior to October 8, 2007, all of which were filed in Knox County.

The petitioner testified that he could read and write and that he answered, "Yes, sir," when the general sessions court judge asked him whether he understood the rights that were read to him.

The petitioner was released from custody on October 8, 2007, but subsequently, his previous parole was revoked, and he was charged in federal court with possessing a firearm as a convicted felon.

Samara Manning testified on behalf of the State in the post-conviction hearing that she had been the petitioner's parole officer since 2006. She said that the petitioner "did very well on parole" until he failed to report on October 4, 2007. She testified that she had informed the petitioner of the rules of his parole including the requirements that he not

-4-

violate any laws and that he not own or possess any type of deadly weapon. She stated that the original parole violation report was engendered by the petitioner's failure to report as scheduled on October 4, 2007, as well as his failure to report his October 5 arrest, about which she was informed due to the arrest "show[ing] up on arrest reports." When asked whether she would have filed the violation report without the petitioner's being convicted, Ms. Manning stated that she "requested the warrant before [she] even knew there were convictions." She explained that she prepares parole violation reports and submits them to "Nashville. Nashville issues the warrant[s]." Ms. Manning recalled that the petitioner was not apprehended on the violation warrant until April 11, 2008 and that, before the Department of Correction held the revocation hearing in June 2008, she had obtained copies of the petitioner's October 2007 conviction judgments and forwarded them to the Department.

On cross-examination, the petitioner's counsel asked whether the general sessions court judge's comment about the petitioner's avoiding jail by staying out of trouble was accurate. Ms. Manning responded, "No, it wouldn't have been. But then again even if he – the charges had been dismissed in court, it wouldn't have been accurate, sir." She then testified that the October "charges" were part of his parole violations but that the convictions themselves were not. She testified that, had he been acquitted of the October 5, 2007 charges, she would have proceeded "anyway and even proceeded with the evading arrest and unlawful possession of the weapon as well as the roadway [violation] and lack of insurance. I could have proceeded . . . even if they had been dismissed in a court . . . and would have." She testified that she could have proceeded because the standard of proof in a parole revocation proceeding – preponderance of the evidence – is less than proving the case beyond a reasonable doubt, the standard used in a criminal case tried in a court. She added, nevertheless, that the failure to report on October 4, 2007, was "in and of itself" a basis for parole revocation. She testified that in the revocation proceeding the petitioner did not challenge the allegations of "technical" violations of parole.

Upon reopening his proof, the petitioner called Isaac Murkle to testify. He testified that he worked as a technology specialist for the public defender's office. He stated that the public defender – the petitioner's counsel – asked him to determine from the audiotape of the petitioner's appearance in general sessions court on October 8, 2007, the time elapsed during the general sessions court judge's individual colloquy with the petitioner. He testified that he determined that the individual colloquy, including the assistant district attorney's introduction of the case, lasted one minute and 12 seconds. The colloquy between the judge and the petitioner lasted 39 seconds.

In its April 21, 2009 order denying post-conviction relief, the post-conviction court held that the general sessions court *en masse* "readings of rights [fell] short of Due

-5-

Process guarantees." The court held, however, that petitioner's plea was knowing and voluntary, and on that basis, it denied relief.

In elucidating its holdings, the court noted that a court entertaining a guilty plea should inform the defendant of his rights, "of what the plea connotes[,] and of its direct consequences." The court further noted, however, that conveying this information to defendants *en masse* may satisfy applicable requirements "so long as the number involved is not so great as to make individual understanding unlikely, and provided each defendant is addressed individually to establish on the record the understanding and agreement of each defendant." The court found that, in the defendant's case, the general sessions court's litany of rights was delivered when "over one hundred (100) people were present in the court room." The post-conviction court noted that during such an *en masse* reading by the court, "people exit and enter the courtroom, talk amongst each other, attorneys shuffle papers, and discuss the day's business." The court also cited the unavailability of an assistant public defender in the general sessions court on October 8, 2007, as well as the delay of an hour between the *en masse* reading and the submission of the petitioner's plea. On these bases, the post-conviction court held that the general sessions court made an "insufficient attempt to comport with [Tennessee Rule of Criminal Procedure] 11, *Boykin* [*v. Alabama*, 395 U.S. 238, 242 (1969)], and *Howell* [*v. State*, 185 S.W.3d 319, 331 (Tenn. 2006)]."

The general sessions court's deficient procedure notwithstanding, the post-conviction court found that the petitioner "possessed adequate knowledge concerning his rights and the magnitude of their waiver to enter a knowing and voluntary plea." The court cited the petitioner's signature denoting his waiver of constitutional rights, and it referred to the petitioner's "extensive history in the criminal court system" that included his submission of 11 guilty pleas between 1995 and 2007. The court also relied upon the petitioner's admission that "he had the opportunity to read the warrants . . . but that he chose not to avail himself of the opportunity to do so."

The post-conviction court further rejected the petitioner's claim that he was misled when the general sessions court and the prosecutor failed to inform him of the consequences of his guilty pleas. The court concluded that the petitioner's parole revocation and his subsequent federal charges were collateral to the direct consequences of his guilty pleas and that neither the general sessions court nor the prosecutor were obliged to inform him of these consequences.

The petitioner's timely appeal followed the denial of post-conviction relief. On appeal, the petitioner claims that his guilty pleas were not knowingly, voluntarily, and intelligently entered, that the warrant for unlawful possession of a weapon failed to allege a criminal offense, and that he was actually innocent of the unlawful possession of a weapon.

We will consider each claim in turn, with a few well-settled principles in mind.

A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103.

*I. Petitioner's guilty plea as voluntary, knowing, and intelligent*

The petitioner claims that his pleas were unknowing and unintelligent because the general sessions court's *en masse* procedure was deficient and not communicative, the court's individual colloquy with the defendant did not serve to inform him of the nature of the charges against him, and the court's references to avoiding jail by staying out of trouble veiled his vulnerability to parole revocation and the filing of federal charges.

"The validity of a guilty plea is a mixed question of law and fact." *Jeffery Aaron Lane v. State*, --- S.W.3d ---, No. E2007-00032-SC-R11-PC, slip op. at 6 (Tenn. July 14, 2010) (citing *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). "Whether a plea was knowing and voluntary is an issue of constitutional dimension because '[t]he due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)).

> A defendant who enters such a plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. For his waiver to be valid under the Due Process Clause, it must be "an intentional relinquishment or abandonment of a known right or privilege." Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void.

-7-

*Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (citation omitted). Thus, "a claim . . . that a plea was not voluntarily and knowingly entered, implicates his due process rights and therefore falls squarely within the ambit of issues appropriately addressed in a post-conviction petition." *Wilson*, 31 S.W.3d at 194. A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Id.* at 195 (quoting *Boykin*, 395 U.S. at 242-43); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) ("Certainly, a plea is not 'voluntary' if it results from ignorance, misunderstanding, coercion, inducements, or threats.") (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)); *see Sexton v. State*, 151 S.W.3d 525, 532 (Tenn. Crim. App. 2004) (stating that "the nature of the proceeding, the exchange between the trial court and the petitioner, and the relatively beneficial plea agreement reflect the petitioner's knowledge and understanding that [his] constitutional rights relative to the trial process were not to be asserted by [him] any further").

In *Boykin*, the United States Supreme Court said that the trial court must question the defendant to ensure that he or she understands that, by entering the guilty plea, he or she is waiving the privilege against self-incrimination, the right to a jury trial, and the right to confront his accusers. *Boykin*, 395 U.S. at 243-44. To the extent that a claim is founded upon a failure to inform the accused that his guilty plea waives certain rights, the three rights specified in *Boykin* form the constitutional touchstone for post-conviction relief purposes. *See Howell v. State*, 185 S.W.3d 319, 331 (Tenn. 2006). The entitlement to being informed of other rights or of certain consequences of the plea emanates from our procedural rules and the Tennessee Supreme Court's supervisory power, *see* Tenn. R. Crim. P. 11(c)(1)-(5); *State v. Neal*, 810 S.W.2d 131, 135-36 (Tenn. 1991); *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977); however, the claim of a lack of information about these rights is not, apart from a claim of involuntary and unknowning guilty plea, *per se* cognizable in a post-conviction proceeding, *see, e.g.*, *Jaco*, 120 S.W.3d at 831; *Rocky Hipps v. State*, No. 03C01-9807-CC-00237, slip op. at 6 (Tenn. Crim. App., Knoxville, Sept. 28, 1999). That said, we know that in evaluating the knowing and voluntary nature of the appellant's pleas, this court must look to the totality of the circumstances. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). We also recognize that a trial court's failure to comply with the non-constitutional provisions of Rule 11(c)(1)-(5) "may contribute to the totality of the circumstances" that reflects an unknowing or unintelligent guilty plea. *Powers v. State*, 942 S.W.2d 551, 555 (Tenn. Crim. App. 1996) (citing *Kenneth Knox Gaddis v. State*, No. 03C01-9303-CR-00064 (Tenn. Crim. App., Knoxville, Jan. 4, 1993)). Our supreme court has noted, however, that

> [a]bsolute literal compliance with the advice to be given by the trial court is not required. Rather, the trial court must

substantially comply with [the] mandates. A trial court
substantially complies with these mandates when it expresses
the sense of the substance of the required advice to a defendant
who is seeking to plead guilty.

*Howell*, 185 S.W.3d at 331 (citations omitted).

In the present case, the rights of confrontation, to jury trial, and to freedom
from compelled self-incrimination were read to the prisoners, including the petitioner,
assembled before the general sessions court on October 8, 2007. The privilege to be free
from self-incrimination was expressed in terms of the petitioner's having the right to refuse
to testify. The court did not inquire of the petitioner about whether he wanted counsel to be
appointed and did not advise the petitioner about the nature of the pending charges.

A certain duality usually guides the determination whether an accused's guilty
plea is made knowingly and intelligently; it entails an examination of the accused's
understanding of (1) the nature of the rights being waived and (2) certain consequences that
emanate from the proposed conviction. In the present case, the petitioner claims that he was
uninformed as to both facets, leveling various claims against the validity of his guilty pleas.
These claims may be organized around our supreme court's regimen of circumstantial
factors, *see Blankenship*, 858 S.W.2d at 904, for analyzing whether a guilty plea is voluntary
and intelligent:

1) the defendant's relative intelligence; 2) the defendant's
familiarity with criminal proceedings; 3) the competency of
counsel and the defendant's opportunity to confer with counsel
about alternatives; 4) the advice of counsel and the court about
the charges and the penalty to be imposed; and 5) the
defendant's reasons for pleading guilty, including the desire to
avoid a greater penalty in a jury trial.

*Howell*, 185 S.W.3d at 331 (citing *Blankenship*, 858 S.W.2d at 904).

*A. The petitioner's relative intelligence*

The record does not well inform us about the intelligence of the petitioner. He
had completed the eighth grade and testified that he could read and write. Although he
testified at the evidentiary hearing that he did not understand many of the concepts employed
by the general sessions court during its *en masse* reading, his testimony was otherwise
reasonably articulate in describing the circumstances of the October 8 hearing. In the general

sessions court judge's individual colloquy with the petitioner, the petitioner responded, "Yes, sir," when the judge asked whether the petitioner understood his rights as explained in the *en masse* reading. In our view, the petitioner did not establish that he was not cognitively capable of entering an informed, knowing, and intelligent guilty plea, but we do not weigh this factor heavily on the State's side of the evaluation ledger.

### B. Petitioner's familiarity with criminal proceedings

The petitioner's familiarity with criminal proceedings weighs heavily in favor of a conclusion that the petitioner's guilty pleas were voluntary, knowing, and intelligent. Although the petitioner had not appeared in court for several years prior to October 8, 2007, the post-conviction court found that he nevertheless was armed with the personal experience of pleading guilty in 11 prior criminal cases, and the petitioner testified that he had been appointed counsel on each such prior case. Such personal experience undoubtedly enabled the petitioner to better comprehend the proceedings on October 8.

Relatedly, the petitioner maintains on appeal that he did not effectively waive his rights via the waiver documents he signed. Although the petitienor testified that he read neither the warrants nor the documents he signed, he did not deny that he had the opportunity to do so. The petitioner articulated no obfuscation by the assistant district attorney general with whom he dealt, and the petitioner had approximately an hour between the time he signed the documents and his individual colloquy with the judge. We infer that the petitioner relied heavily upon his prior experiences with pleading guilty in expediting his pleas on October 8, 2007, without reading the warrants or waivers.

### C. Availability, competency, and advice of counsel

In his brief, the petitioner strongly prefaced his challenge to his guilty pleas on the basis that he was not represented by counsel. We find no indication in the record that either the attending assistant district attorney general or the general sessions court judge asked the petitioner whether he wanted an attorney appointed to represent him. We know that, prior to appearing in court on October 8, 2007, the petitioner signed an affidavit of indigency prefatory to having counsel appointed. We conclude, however, that the record fails to evince a basis for impugning the convictions on the ground that the petitioner was denied the assistance of counsel.

The petitioner signed waivers of his right to counsel. The language of one such waiver was printed on a page that apparently was separate from the warrant form, and the waiver stated that the petitioner "voluntarily waive[d] all of the above rights," including the right to "have an attorney represent [him]" and to have an attorney appointed if he could not

afford one. The petitioner signed the waiver on October 8, 2007, apparently after the general sessions court explained to the assembled prisoners, including the petitioner, the right to counsel and the right to have counsel appointed if necessary. In addition to signing the waivers of counsel, the petitioner had pleaded guilty in 11 criminal cases prior to October 8, 2007, and he had been appointed counsel on each such prior case. We must recognize that most waivers of the right to counsel are submitted by defendants who, at the time of waivers, are not represented by counsel, and yet courts routinely accept waivers and, if applicable, the ensuing guilty pleas tendered voluntarily by competent, informed defendants. The attorney waiver in the present case is not anomalous. The record in the present case supports the post-conviction court's conclusion that the defendant validly waived his right to counsel. As such, we do not weigh the lack of representation by counsel in favor of the petitioner.

## D. Advice of the court

The nuances of the petitioner's claims under the rubric of being uninformed or misinformed by the general sessions court are manifold. As we noted above, the petitioner did not have the advice of counsel. Moreover, he complains that he never received a copy of the warrants and that no one explained to him the nature of the charges filed against him. We recognize that the petitioner's arraignment scheduled for October 6, 2007, was canceled due to a malfunction of recording equipment. We also recognize that neither the transcript of the *en masse* proceeding nor that of the general sessions court judge's individual colloquy with the petitioner shows that the petitioner was informed of the nature of the offenses with which he was charged. The post-conviction judge, however, determined essentially that the petitioner's familiarity with the criminal justice system in Knox County and his prior use of appointed counsel equipped him to understand, assimilate, and respond to the information that was presented or availed to him on October 8, 2007. We cannot say that the record belies these determinations.

By his own testimony, the petitioner revealed that the prosecutor who dealt with him on October 8, 2007, accurately informed him of the charges. The petitioner intelligently discussed with the prosecutor the issue whether the evading arrest charge should be a felony or a misdemeanor. His understanding of the forfeiture of the weapon indicates comprehension of the weapon possession charge. The record supports the view that the petitioner was willing to expedite the general sessions court process in order to gain his immediate release from confinement, and he achieved that goal.

At one point in the petitioner's brief, he states that neither the *en masse* reading nor the individual colloquy communicated to him that by pleading guilty he would be waiving his various constitutional rights. Although we agree that such language does not appear in the transcripts of those two proceedings, the waiver of constitutional and other

-11-

rights as a function of a guilty plea was stated in the separate rights waiver form that the defendant signed. As indicated above, we see no reason to minimize the efficacy of the written waiver.

The petitioner next relies upon the post-conviction court's agreeing with him that chaos prevailed in the general sessions court during the latter court's reading to the prisoners *en masse* to support his claim that the procedure was ineffectual to inform him of his constitutional rights. The post-conviction court found that, during the reading, the courtroom contained a large number of people, attorneys moved about, and people entered and left the court room and engaged in conversation. The post-conviction court concluded that the general sessions court's procedure on October 8, 2007, was deficient by the measure of due process and Tennessee Rule of Criminal Procedure 11. Nevertheless, the post-conviction court held, the petitioner was adequately informed and knowing when he entered his pleas.

Our supreme court has said that

> a trial court substantially complies with the mandates of *Boykin*, *Neal*, and Rule 11 of the Tennessee Rules of Criminal Procedure when the trial court communicates the entire litany of rights and other required information "to multiple defendants in the presence of their respective attorneys, so long as the number involved is not so great as to make individual understanding unlikely; and provided that each defendant is addressed individually to establish on the record the understanding and agreement of each defendant."

*Howell*, 185 S.W.3d at 332 (quoting *Neal*, 810 S.W.2d at 137-38). "Therefore," the court added, "while we caution trial courts against conducting group plea hearings, such hearings do not constitute *per se* violations of *Boykin*, *Neal*, and Rule 11 of the Tennessee Rules of Criminal Procedure." *Id.* at 332.

The post-conviction court's determination that the *en masse* proceeding was essentially inimical to "individual understanding" does not equate, in this instance, to a determination that the petitioner did not understand the constitutional implications of his plea. *See Johnson v. State*, 834 S.W.2d 922, 925 (Tenn. 1992) "It is the result, not the process, that is essential to a valid plea. The critical fact is the defendant's knowledge of certain rights, not that the trial judge was the source of that knowledge." *Id.* at 924. "[T]he petitioner actually may have been aware of his constitutional rights even though the trial court failed to advise him of them and failed to determine at the plea hearing that petitioner

-12-

was aware of his rights." *Id.* at 925. That is exactly what happened in the petitioner's case. The post-conviction court determined that, despite the shortcomings of the *en masse* proceeding, the defendant entered a valid plea. To put it more exactly, the post-conviction court held that the petitioner failed to carry his burden of proving by clear and convincing evidence that his plea was not voluntary, knowing, or intelligent.

Even when a post-conviction petitioner establishes "that the trial court failed to advise the petitioner of his right against self-incrimination and that the trial court failed to determine that the plea was knowing and voluntary," the petitioner is not "ipso facto, entitle[d] . . . to relief." *Id.* Instead, such a showing "is sufficient to shift the burden of going forward to the State," and

> [t]he State may rebut the allegation with proof of substantial compliance with the advice requirement, which would show that the petitioner was made aware of his constitutional rights, or the State alternatively may show that the petitioner was aware of his constitutional rights and that therefore the trial court's failure to give the mandated advice was harmless error.

*Id.* The post-conviction court took the latter track, and the record supports that court's determination that the State countered the petitioner's evidence of a deficient *en masse* hearing. *See Neal*, 810 S.W.2d at 139 (holding that when the petitioner establishes that the trial court failed to inform him of his constitutional rights and that he would not have pleaded guilty absent the omission, "then the burden shifts to the State to justify the error by establishing through extrinsic evidence the defendant's knowing and voluntary relinquishment of the involved constitutional protections, despite the erroneous omission"). In this case, "the [general sessions] court's failure to advise [the petitioner] of . . . constitutional right[s] was harmless error." *Johnson*, 834 S.W.2d at 926.

We move now to consider the general sessions court's handling of the individual colloquy with the petitioner. The petitioner maintains that, in the colloquy, he was both under informed and misinformed about important consequences of his convictions. First, he claims that the general sessions court failed to inform him of the nature of the charges and of the waiver effect of a guilty plea. We have already dealt with these claims above and concluded that the petitioner is not entitled to relief on these issues. Second, the petitioner claims that the court failed to inform him of his vulnerability to parole revocation and/or the filing of federal charges based upon his pleading guilty and that the general sessions court actually misinformed the petitioner about this vulnerability by telling the petitioner that he could avoid jail by staying out of trouble.

-13-

The United States Supreme Court, in *Brady v. United States*, 397 U.S. 742 (1970), mentioned that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 748; *see also Blankenship*, 858 S.W.2d at 904 (stating that, pursuant to *Boykin*, the trial court is obliged to "'canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequences'") (quoting *Boykin*, 395 U.S. at 244). However, "[c]ourts are constitutionally required to notify defendants of only the direct consequences–not the collateral consequences –of a guilty plea." *Marcus Ward v. State*, --- S.W.3d ---, No. W2007-01632-SC-R11-PC, slip op. at 5 (Tenn., Jackson, July 7, 2010).[2] "The most obvious 'direct consequence' of a conviction is the penalty to be imposed. It is, therefore, well-recognized that the defendant must be apprised of the sentence that he will be forced to serve as the result of his guilty plea and conviction." *Blankenship,* 858 S.W.2d at 905.

In *Marcus Ward*, our supreme court applied a distinction between direct and collateral consequences that turned on whether the consequence was punitive. It held that, on the one hand, a consequence of a guilty-pleaded conviction that was merely "remedial and regulatory," having "no effect on his range of punishment," was a collateral consequence of a guilty plea. *Marcus Ward*, --- S.W.3d at ---, slip op. at 8, 12. A trial court has no duty to advise a guilty-pleading defendant of a collateral consequence of his plea. *Id.*, slip op. at 6. On the other hand, a "punitive" consequence of a guilty plea – one that entails "an additional part of a defendant's sentence" – is a direct consequence of the plea, and it imposes upon the trial court "an affirmative duty to ensure that a defendant is informed and aware of the [consequence] prior to accepting the plea." *Id.* at __, slip op. at 14-17. Our supreme court pointed to legislative intent as a primary consideration for assisting a court in deciding whether a particular consequence of a plea is punitive and thus direct. Although legislative intent may not be dispositive, the court said, it should be "afforded considerable deference" such that "'[i]f the intention of the legislature was to impose punishment, that ends the inquiry.'" *Id.* at __, slip op. at 14-15 (quoting *Smith v. Doe*, 538 U.S. 84, 92-93 (2003), (emphasis in *Marcus Ward* omitted). In *Marcus Ward*, the court looked to certain markers of legislative intent: whether the legislature, in enacting provisions resulting in the

---

[2]In *Marcus Ward*, the supreme court adjudicated an issue of the validity of guilty pleas and the obligation of the trial court to inform a defendant of certain consequences of his pleas. A similar rule has been applied to the advice rendered (or omitted) by a defendant's attorney for purposes of evaluating a constitutional claim of ineffective assistance of counsel, *see, e.g.*, *Adkins v. State,* 911 S.W.2d 334, 359 (Tenn. Crim. App. 1994), but we note that the United States Supreme Court has commented that, at least in the realm of ineffective assistance of counsel, "We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland* [*v. Washington*], 466 U.S. [668], 689 [(1984)]." *Padilla v. Kentucky*, --- U.S. ---, 130 S. Ct. 1473, 1481 (2010).

-14-

consequence, declared its intent; whether the language used by the legislature indicates "punitive intent"; and whether the legal provision at issue utilized the word "sentence" in describing its effect. *Id.* The court also looked at the punitive "effect" of the statute in question. *Id.*, slip op. at 15.

In the present case, however, we need not determine whether the petitioner's state parole revocation or the filing of a federal weapons charge was a direct or collateral consequence of his guilty pleas. We hold that the record fails to establish by clear and convincing evidence that these post-plea events were consequences of the guilty pleas and/or their resulting convictions.

The petitioner testified that his Tennessee parole was revoked and that federal charges were filed as a result of his general sessions court convictions; however, the remaining post-conviction evidence does not bear out these claims.

The petitioner's parole officer testified that the petitioner failed to report to her as required on October 4, 2007, and that she learned of the new warrants via an "arrest report." She testified that the parole revocation warrant was based, therefore, upon the petitioner's failures to report and to inform her office of his arrests as much as it was based upon his pleas or convictions. Indeed, she testified that even had the petitioner been tried and acquitted of the charges in general sessions court, she would have nevertheless proceeded to have his parole revoked. Accordingly, we cannot say that the parole revocation was a consequence at all of the guilty pleas or the resulting convictions.

Additionally, it appears that the federal weapons charge filed against the petitioner was the result of his *being* a felon in possession of a deadly weapon. As such, the charge was not a consequence of the petitioner's guilty plea or his state weapons conviction. The federal government was free to file the federal weapons charge against the petitioner even absent his pleading guilty in the general sessions court.

Moreover, the fact that neither the parole revocation nor the federal weapons charge was a consequence, either direct or collateral, of the petitioner's pleas is further demonstrated by the fact that a grant of post-conviction relief from the guilty-pleaded misdemeanor convictions in this case would not result in the removal of either the parole revocation or the federal charge. Based upon these determinations, the general sessions court was not obliged constitutionally to advise the petitioner about his vulnerability to parole revocation or the filing of a federal charge.

The question remains, then, whether the general sessions court, although not obliged to advise or inform the petitioner about parole revocation or a federal charge, actually

-15-

misinformed the petitioner about these possibilities. The petitioner cites that court's reference to the petitioner's staying out of jail by staying out of further trouble as inaccurate and misleading. We disagree that the general sessions court judge's comments to this effect embraced consequences beyond the probation that he was imposing, and even if the comments could be construed more broadly, as the petitioner urges, they came after the petitioner made his plea arrangement.

In his individual colloquy with the petitioner, the judge told him, as the petitioner alleges, "So it's up to you[.] [I]f you want to stay out of jail[,] don't get in trouble, that's all you got to do." These comments must be placed in context, however, by considering the statements made by the judge immediately before the above statements:

> You got to stay out of trouble and pay the costs. Your weapons possession will be time served but you have to forfeit the weapon. Do you understand? Means you got to stay out of trouble for 11 months 29 days. If you don't[,] you're going to be going like these other people that have been coming up here and messing up, do you understand?

Clearly, based upon the full statements of the judge, the comment that staying out of trouble was all the petitioner had to do was in reference to the petitioner's avoiding revocation of his new probation. We cannot fathom how the comment, in context, could be understood to mean that the petitioner, in pleading guilty, was somehow galvanized from any further repercussions of his October 5, 2007 conduct.

Furthermore, the petitioner had bargained with the prosecutor for a plea deal that would allow him immediate release from custody, his avowed goal at the time. Even if the judge's "all you got to do" comment could be construed as having application broader than the probation being then imposed, we reject the notion that, but for this comment, the defendant would have eschewed the pleas. Also, we cannot see that the comment in any way induced the petitioner to plead guilty or in any way beguiled him into departing from a course he would otherwise have pursued. In other words, even if the comment could be construed as misinformation, it was harmless beyond a reasonable doubt. *See Marcus Ward*, --- S.W.3d at ---, slip op. at 17-18 (applying constitutional harmless error analysis to a *Boykin/Blankenship* error). In consequence, we see nothing in the general sessions court's individual colloquy with the petitioner that weighs in favor of a finding that the petitioner's guilty pleas were not knowingly, intelligently, and voluntarily entered. Indeed, this factor weighs in favor of the State.

-16-

*E. Petitioner's reasons for pleading guilty*

Next, we consider the petitioner's reasons for pleading guilty. The petitioner argues that the desire to avoid a greater penalty in a jury trial did not factor into his decision to plead guilty. Although such may be true, the gravamen of the matter is that he opted for a disposition of his charges that minimized penalties and provided for dismissal of some charges. In fact, the plea agreement provided for no additional penalties other than paying costs, forfeiting the weapon, and completing 11 months and 29 days of unsupervised probation. The plea agreement offered obvious benefit to the petitioner, and he affirmatively took action to claim that benefit.

> "[A] defendant who acts in his own best interest, voluntarily and
> intelligently pleading guilty to a charge for which there is little
> factual foundation, and waiving any objection to the charge, and
> who later attempts to attack the plea for which he bargained, has
> no basis for a constitutional challenge to the conviction. He has,
> at best, invited error, and, at worst, attempted to manipulate the
> court."

*Powers v. State*, 942 S.W.2d 551, 555 (Tenn. Crim. App. 1996) (quoting *Kenneth Knox Gaddis v. State*, No. 03C01-9303-CR-00064 (Tenn. Crim. App., Knoxville, Jan. 4, 1993)). We believe this evaluation factor weighs in favor of the State.

Having thoroughly examined the five *Howell* factors, our conclusion here is that the record supports the post-conviction court's determination that the petitioner was adequately informed to make a voluntary, knowing, and intelligent plea and that any shortcomings in the general sessions court's procedure are either not cognizable in a post-conviction proceeding or were harmless beyond a reasonable doubt.

*II. Validity of warrant charging unlawful possession of a weapon*

In his next issue, the petitioner claims that the warrant charging illegal possession of a weapon failed to allege a criminal offense. The affidavit of complaint for this warrant described the police officer's stopping the petitioner's vehicle and observing a "Glen Field .22, serial number 27316841, in the back seat of the vehicle. There was ammunition available for it. . . . . Records revealed the defendant to have a felony drug conviction from 09-16-1998." The petitioner claims that the warrant fatally failed to allege that he carried the weapon with the intent to go armed, citing Tennessee Code Annotated section 39-17-1307. That code section proscribes as an offense a person's carrying "with the intent to go armed a firearm." T.C.A. § 39-17-1307(a)(1). The offense described in Code

-17-

section 39-17-1307(a)(1) is a Class C misdemeanor. *Id.* § 39-17-1307(a)(2)(A). As an alternative to the crime defined in subsection (a)(1), Code section 1307 also proscribes the possession of "a handgun" by a person who has been convicted of a felony drug offense. *Id.* § 39-14-1307(b)(1)(B). This offense is a Class E felony. *Id.* § 39-17-1307(b)(2).

"A warrant of arrest is an order, in writing, stating the substance of the complaint, directed to a proper officer, signed by a magistrate, and commanding the arrest of the defendant." *Id.* § 40-6-201. "The written examination shall set forth the facts stated by the affiant or affiants that establish that there is probable cause to believe an offense has been committed and that the defendant committed it." *Id.* § 40-6-204. Tennessee Rule of Criminal Procedure 3 provides:

> The affidavit of complaint is a statement alleging that a person has committed an offense. It must:
>
> (a) be in writing;
>
> (b) be made on oath before a magistrate or a neutral and detached court clerk authorized by Rule 4 to make a probable cause determination; and
>
> (c) allege the essential facts constituting the offense charged.

Tenn. R. Crim. P. 3. The petitioner posits that the affidavit of complaint failed to satisfy the combined requirements of these Code sections and Rule 3 and that, accordingly, the resulting warrant was void "and all subsequent proceedings are invalidated." The State argues that the issue is waived by virtue of the guilty pleas and that the warrant on the weapon possession charge was, at any rate, valid.

First, we must reject the State's claim that the issue was waived upon the petitioner's guilty pleas. Certainly, a valid guilty plea "constitutes an admission of all facts necessary to convict and waives all non-jurisdictional defects and constitutional irregularities which may have existed prior to the entry of the guilty plea." *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). However, "a guilty plea waives only non-jurisdictional defects." *Edwards v. State,* 269 S.W.3d 915, 921 (Tenn. 2008). For this reason, a guilty plea does not confer jurisdiction upon a trial court that otherwise lacked jurisdiction. *Id.* The essence of the petitioner's challenge to the warrant is that it is void and that, therefore, the general sessions court lacked jurisdiction to enter a conviction. Because the petitioner's claim challenges the jurisdiction of the general sessions court, it was not waived by his pleading

-18-

guilty, and we move on to analyze the validity of the warrant.

We hold that the affidavit of complaint in the warrant was sufficient to charge a violation of Tennessee Code Annotated section 39-17-1307(a)(1) – carrying a firearm with the intent to go armed. The warrant alleged a violation of section 39-17-1307 and the commission of a Class C misdemeanor; subsection (a)(1) is the only offense described in section -1307 that is classified as a Class C misdemeanor. As such, we believe that the statutory reference, together with the factual allegations, gave the petitioner adequate notice of the charged offense. In Tennessee, an indictment as a charging instrument is sufficient if it references the appropriate statute and otherwise meets the statutory requirement for an indictment. *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999) (citing *State v. Hill*, 954 S.W.2d 725, 726-27 (Tenn. 1997)). We believe that the requirements for a warrant are no more demanding than are those for an indictment. *See Berry v. City of Memphis*, 354 S.W.2d 71, 72 (Tenn. 1961) (holding that a warrant alleging merely a "Vio. Sec. 759, Indecent Conduct" was sufficient to put Berry on notice "that he must expect proof of having committed one or more of the five acts constituting the offense" and was, therefore, "sufficient and valid").

In adjudicating a warrant charging exceeding the speed limit, our supreme court has said,

> "The declaration should state the cause of action clearly, explicitly, and briefly.
>
> "But how clear and explicit must the statement be? No more than to convey a 'reasonable certainty of meaning,' and 'by a fair and natural construction,' to show a substantial cause of action. No cavil, or straining, or criticism, is to be allowed as ground of exception, if the statement is intelligible enough, according to the ordinary meaning of the language used."

*Guidi v. City of Memphis*, 263 S.W.2d 532, 534 (Tenn. 1953) (quoting *Caruthers History of a Lawsuit*, Gilreath's Revision, Seventh Edition, § 108, p. 114). We conclude that the affidavit of complaint in the present case satisfies this description. *See Guidi*, 263 S.W.2d at 535 ("Moreover we think the language in the warrant is sufficient notice to the defendant that he was arrested for exceeding the speed limit as fixed by the laws and ordinances of the City of Memphis. We are justified in the assumption that the defendant was driving an automobile when he was arrested and held a driver's license which authorized him to operate it. It is not unreasonable to suppose that operators of motor-propelled vehicles in Memphis and Shelby County are fully cognizant of all traffic laws in said city, including the limit as

to the speed of such vehicles."); *State v. David Nathaniel Cope*, No. E2006-01005-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Knoxville, Sept. 19, 2007) (finding that although warrant alleging driving under the influence failed to allege that Cope drove in "any of the locations required under the DUI statute for the commission of that offense," warrant was sufficient and valid because it could be inferred from the language in the affidavit of complaint that he drove "on the road or on the premises of the apartment complex"), *perm. app. denied* (Tenn. 2008).

### III. Actual innocence of unlawful possession of a weapon

In his final issue, the petitioner claims post-conviction relief on the ground that he is actually innocent of the offense alleged in the weapon possession warrant. In his brief, his entire argument on this point is the following:

> [The weapon possession w]arrant . . . states that the officers observed an unloaded rifle in the back of [the petitioner's] vehicle. It was not a crime in September of 2007 for [the petitioner] to possess an unloaded rifle. In order for [the petitioner] to be guilty, he would have had to carry the rifle with the intent to go armed. [The] warrant . . . does not contain facts stating that [he] intended to go armed. Thus, he is factually innocent.

This issue as framed brings to mind interesting issues such as whether the claim is justiciable in a post-conviction proceeding, *see Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009) (noting that the justiciability of free-standing actual innocence claims as part of a collateral attack was "'left open' and 'unresolved'" in the wake of *Herrera v. Collins*, 506 U.S. 390 (1993) (quoting *House v. Bell*, 547 U.S. 518, 554-55 (2006)), and whether the otherwise valid guilty plea on weapon possession foreclosed the claim, *see Pettus*, 986 S.W.2d at 542 (holding that "the voluntary entry of an informed and counseled guilty plea constitutes an admission of all facts necessary to convict"). We do not address these issues, however, because the argument on the issue contains no citation to authority. For that reason, we conclude that this issue is waived. *See* Tenn. R. Ct. Crim. App. 10 (stating that issues not supported by citation to authority are waived). Thus, no post-conviction relief is implicated in this third and final issue.

### V. Conclusion

The petitioner failed to establish his claims in the post-conviction court by clear and convincing evidence or to carry his burden on appeal. The record supports the denial of

post-conviction relief and reveals that although the Knox County General Sessions Court's procedure in handling guilty pleas on the day of the petitioner's appearance was deficient by the standards of due process and of Tennessee Rule of Criminal Procedure 11, the petitioner was otherwise informed and did submit voluntary, knowing, and intelligent guilty pleas to valid arrest warrants. His claim of actual innocence is thwarted by his failure to cite to authority. Accordingly, the order of the post-conviction court is affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE